(C. D. 840)

CORPORACION ARGENTINA DE PRODUCTORES DE CARNES *v.* UNITED STATES

United States Customs Court, Third Division

(Decided March 29, 1944)

*Barnes, Richardson & Colburn* (*J. Bradley Colburn* of counsel) for the plaintiff.
*Paul P. Rao*, Assistant Attorney General (*William J. Vitale*, special attorney), for the defendant.

Before CLINE, KEEFE, and EKWALL, Judges

KEEFE, Judge: In this case certain merchandise invoiced as dog food was imported from Argentina. It was assessed with duty at 20 per centum ad valorem under paragraph 1558 of the Tariff Act of 1930. The plaintiff claims that it is properly dutiable at 10 per centum ad valorem under paragraph 730 providing for mixed feeds, or, alternatively, it is dutiable thereunder at 5 per centum ad valorem by reason of amendment under the trade agreement with Canada, T. D. 49752.

The pertinent portions of paragraph 730 of the Tariff Act of 1930 provide as follows:

PAR. 730. * * * mixed feeds, consisting of an admixture of grains or grain products with oil cake, oil-cake meal, molasses, or other feedstuffs, 10 per centum ad valorem.

In the second trade agreement between the United States and Canada, entered into on November 17, 1938, T. D. 49752, the rate of duty was changed from 10 per centum ad valorem to 5 per centum ad valorem, in respect to mixed feeds as provided for in paragraph 730.

The paragraph of the law under which duty was assessed by the collector reads in part as follows:

PAR. 1558. That there shall be levied, collected, and paid * * * on all articles manufactured, in whole or in part, not specially provided for, a duty of 20 per centum ad valorem.

At the trial the manager of the plaintiff's New York office testified that he supplied the packer with the formula to be followed in the manufacture of the dog food in question; that it was to be composed of 82 per centum beef, 9 per centum cereal, 3 per centum carrots, 3 per centum spinach, and 3 per centum brewers' yeast; that he observed the preparation of samples of the dog food according to such formula at the manufacturing plant in Argentina; and that he had seen the samples tested in the laboratory of the factory and observed the ingredients as they were inserted into the batch which made up the sample. He admitted, however, that he had not observed the actual commercial production of the imported dog food.

The witness testified that he had examined the merchandise in question at the time of its arrival in the United States and found it was made according to the same formula and that the cereal therein was corn meal. However, he admitted that he was not a chemist and did not have an analysis of the merchandise made to determine its composition. As to the imported merchandise conforming to the sample, he testified in manner following:

X Q. You are only assuming that because you told them to put at least 9 percent grain in the merchandise that they put that much in it?—A. I had told them several times, because it is very important, and I have no reason to suspect that they don't do it.

Continuing his testimony the witness stated that prior to becoming associated with the plaintiff he was commercial attaché of the Argentine Embassy in Washington; that while holding such position he became interested in the importation into the United States of dog food from Argentina and presented to the customs officials in Washington the question of classification of dog food of the type to be produced; and that in relation to such inquiry a letter was received from the Customs Bureau by the Embassy relative to the classification of dog foods, a

copy thereof being admitted in evidence as exhibit 1. A copy of a letter written by the Commissioner of Customs to customs officers, relative to dog food, was also admitted on behalf of the plaintiff as exhibit 2. These letters indicate that the Customs Bureau recognizes that dog food, if unfit for human consumption, and imported in condition ready for feeding purposes rather than as an ingredient of a dog food and containing a substantial amount of grain or grain products, is classifiable as a mixed feed. Two letters of the same import, marked in evidence as exhibits 3 and 4, were admitted on behalf of the Government. These exhibits indicate that a substantial quantity of grain or grain products is to be regarded as 8 per centum or more to bring the product under the provisions of paragraph 730 as a mixed feed.

Plaintiff's second witness was the distributor of the dog food in the United States. He testified that he had surveyed the various meat fields outside of the United States in an endeavor to procure dog food; that he has given particular attention to the dietary needs of dogs and is familiar with various packaged dog foods and their dietary values as well as the components thereof; that the feeding requirements of dogs are rather general, inasmuch as the dog needs a percentage of meat and a percentage of grain, which can vary slightly in the ratios of beef and grain; that he had worked out the formula for the dog food in question and has fed dogs with it and found that it is a complete dog food and that dogs thrive on it; that the grain therein is used as a filler and constitutes the substance that holds the nutriment in the dog's stomach until digestion is complete; that it is necessary to add certain other ingredients to the meat to hold this food in the stomach, the digesting process being about twice as long as in a person; that for the same function of holding the meat in the dog's stomach vegetables may be used; that the vegetables in the dog food take the place of an equivalent amount of grain, particularly as a filler or roughage component and are more valuable because there are vitamins in the vegetable juice.

He also testified that the imported dog food compares with a dog food containing approximately 50.8 per centum meat, 15.2 per centum bone, 8.6 per centum cereal, and 25 per centum water. In that regard he stated that "It feeds the dog, and the dog eats it, and the function is accomplished." (Record page 21.) He was also of the opinion that the food values and the results upon the dog would be about the same, and that the dog would thrive eating either food.

The witness further testified that he is familiar with similar dog foods under the trade names of "Pard" and "Red Heart" and that the dog food in question competes with such foods and he has observed that the results upon the dogs eating the several dog foods is the same. In his opinion, a dog food containing 80 per centum meat, 10 per centum grain, 10 per centum bonemeal, would serve exactly the same purpose, have the same nutritive value as a dog food com-

posed of 82 per centum meat, 9 per centum grain, 3 per centum carrots, 3 per centum spinach, and 3 per centum yeast; that each would be a complete dog food and a dog would thrive on either or both of those diets. According to the witness the dog food he imported was approximately 80 per centum meat, 6 per centum vegetable content, 3 per centum yeast, and the remainder, according to the formula, consisted of grain; that such dog food had been practically uniform during the entire time he has been importing it and that it conformed to the sample, for at any rate he "has had no complaints." The witness was of the opinion that if the dog food had contained approximately 80 per centum meat, 5 per centum grain, a small percentage of yeast and the remainder vegetables, such dog food would, generally speaking, be very much like the product he imported, in that it would be used in the same way; would serve the same purpose; the nutritive value would be substantially the same, and that a dog eating the one food would thrive as well as when eating the other.

As to whether the merchandise was unfit for human consumption the witness testified as follows:

Q. Is it packaged—will you state whether or not it is packaged primarily for use as a dog food?—A. Oh, absolutely.

Q. Well, in that sense is it intended or fit for human consumption?—A. It is not intended for human consumption. If sombody wanted to eat it I suppose they could, although I know of no case where anybody ever ate it. As a matter of fact, it sold for 15 cents. People with 15 cents usually have a little too much pride. I have heard stories of 5-cent food being eaten.

Q. Would you say it was, on the basis of your experience, that it was palatable to the human taste?—A. No, although I admit I have tasted it at dog shows. It does not have any salt; it is very flat; and I don't think anybody would want to eat it twice. (Record page 19.)

The only witness presented on the part of the Government was a chemist in the customs laboratory. He testified that he made an analysis of the imported dog food and that he filed a report thereof; that he was requested to determine the percentage of grain or grain products; that he found the sample examined by him contained 5.8 per centum grain products, calculated as corn meal. In making his determination he analyzed the commodity for the percentage of starch, conducting his analysis as follows: He received a sample can of the merchandise and put the contents through a meat-chopping machine two or three times. He then weighed therefrom 1.0356 grams, which he treated to determine the percentage of starch, having been previously informed that the grain product therein was corn meal. Upon determining that the content of starch was 2.92 per centum, and knowing that the factor of starch in corn meal was 50 per centum, the corn meal in the sample was found to be 5.8 per centum.

The question presented in this case is whether or not the dog food contains sufficient grain or grain products as well as other articles

named in the paragraph, either directly or by similitude, to bring it within the definition of a mixed feed as contained in paragraph 730. Apparently both parties are satisfied that dog food containing grain or grain products in substantial quantities, together with meat, vegetables, etc., is properly within the terms of paragraph 730.

The plaintiff contends that the dog food here comes within the definition of mixed feeds and that the Treasury Department's limitation of the grain content to a minimum of 8 per centum is illegal.

The Government maintains that the only question involved is whether or not the 5.8 per centum of grain products calculated as corn meal constitutes a *substantial* quantity of grains or grain products and that such quantity is sufficient to bring the article within the provisions of paragraph 730, and contends that plaintiff has failed to prove the constituent parts of the article, or that it is similar either in material, quality, texture, or use to which it may be applied, to any article enumerated in paragraph 730. It is argued by the Government that paragraph 730 is essentially a grain paragraph and intended to cover articles consisting of at least a substantial quantity of grain, when mixed with oil cake, oil-cake meal, molasses, or other feedstuffs, or such articles as constitute an admixture of at least a substantial amount of two or more of the articles therein specified; and that since the competent evidence proves the extent and quantity of the grain products found in the imported merchandise, the question of classification should be confined to a discussion concerning whether or not the grain products found therein are sufficient in quantity to warrant classification as claimed. The Government relies upon the cases of *Westergaard* v. *United States*, 19 C. C. P. A. 299, T. D. 45469, and *Union Supply Co.* v. *United States*, 67 Treas. Dec. 631, T. D. 47645. In the *Westergaard* case the appellate court, in commenting upon paragraph 773, act of 1922, correlative with paragraph 774, act of 1930, covering vegetables, stated:

Paragraph 773 is essentially a vegetable paragraph, and we think the Congress clearly intended that the articles covered thereby should consist of at least a substantial quantity of vegetables.

In the *Union Supply Co.* case certain canned pork and peas, a cooked mixture of ground pork and whole green peas, consisting of 4.29 per centum peas and 95.71 per centum pork by weight, was assessed for duty under paragraph 706 as meat prepared or preserved. The plaintiff claimed it dutiable under paragraph 703 as pork prepared or preserved, or under paragraph 775 as hash and similar forms composed of vegetables and meat, or as a nonenumerated manufactured article under paragraph 1558. In holding the product dutiable under paragraph 1558, the court stated:

In the instant case the record shows the commodity to consist of a mixture of pork which has been ground, and whole peas. We think that is sufficient to bring

it within the descriptive term "hash, and all similar forms." However the quantity of peas is agreed to be 4.29 per centum by weight as against 95.71 per centum pork. Under the construction placed upon the paragraph by the court of appeals above-quoted, we find that it is not a substantial quantity of vegetables, and the commodity is therefore not within the purview of that provision in paragraph 775.

The court further held it excluded from paragraph 703 because it was a mixture of prepared pork and vegetables, thus being something more than prepared pork, and that as the meat was pork it was removed from paragraph 706, inasmuch as prepared pork was meat which had been separately provided for.

The question concerning the classification of dog food as mixed feeds first came before this court in the case of *Byrnes* v. *United States,* Abstract 42989. There the evidence consisted of an agreed statement of facts, wherein it was stipulated between the parties that the merchandise consisted of the following:

\* \* \* dog food containing a substantial quantity of grains with other feedstuffs (cracked wheat and barley, dry meat, water, and bonemeal) unfit for human consumption, and that it is ready for use as a feed for dogs and is not a material used in the making of feeds, of the same kind in all material respects as the dog food which was the subject of review in a letter by the Commissioner of Customs on October 28, 1938, a copy of which is attached hereto and marked exhibit A, wherein the Commissioner ruled that this merchandise should be assessed with duty at 10 per centum ad valorem under par. 730; \* \* \* .

The Government there admitted that dog food was a mixed feed and that it contained all the ingredients necessary for classification under the mixed-feed provision. In view of such stipulation the merchandise was held classifiable under paragraph 730 as a mixed feed, and judgment entered in favor of the importer.

The plaintiff previously imported certain dog food which became the subject of decision by this court. See *Corporacion Argentina de Productores de Carnes* v. *United States* (6 Cust. Ct. 211, C. D. 464). There the merchandise consisted of 80 per centum beef cubes and stock, 5 per centum carrots, 5 per centum spinach, and 10 per centum bonemeal. This court held it excluded from the provisions of paragraph 730 because it did not contain any grain products and, although of the opinion that it bore a similitude of use to dog food, held the similitude provision inapplicable because of the absence of any grain or grain product, observing that dog food had previously been held dutiable as a mixed feed when containing grain admixed with other feedstuffs. Our appellate court, however, upon appeal (See *Corporacion Argentina de Productores de Carnes* v. *United States,* 29 C. C. P. A. 288, C. A. D. 204) held that the application of the similitude provision was not excluded because of the absence of grain or grain products, but, on the other hand, found that there was not any similitude in material, quality, texture or use to any of the articles enumerated in

the paragraph. The language of the court in reference to similitude was as follows:

> Although it is clear that the provision for mixed feeds contained in paragraph 730, *supra*, is limited to such feeds as consist of an "admixture of grains or grain products with oil cake, oil-cake meal, molasses, or other feed stuffs," and that the involved merchandise is not dutiable directly under that provision (*United States* v. *F. W. Myers & Co., Inc.*, 29 C. C. P. A. (Customs) 34, C. A. D. 168), we find nothing therein to indicate that the Congress intended to exclude therefrom such mixed animal feeds as were substantially similar in material, quality, texture, or use to those specially provided for in that paragraph. We conclude, therefore, that the trial court erred in holding that the similitude provision was not intended by the Congress to apply to the mixed feeds provision contained in paragraph 730, *supra*.

> \* \* .\* \* \* \* \*

> Appellant's witness testified that the various dog foods referred to in his testimony, including the dog food here involved, are fed to dogs. However, *the mere fact that the involved dog food and other dog foods containing a small percentage of grain or grain products are used as dog foods does not establish that the use of the involved dog food is substantially similar to the use of dog foods containing grain or grain products, even if it be assumed that dog food containing a small percentage of grain or grain products* (which grain or grain products the witness stated were not of importance "in the trade") *were intended by the Congress to be specially provided for under the provision for mixed feeds contained in paragraph 730, supra, Lang* v. *United States*, 4 Ct. Cust. Appls. 129, T. D. 33394. *Nor is there any evidence of record that the involved dog food has substantially the same nutritive value, or that it produces substantially the same results, as any of the mixed feeds specially provided for in paragraph 730, supra.* See *Murphy* v. *Aranson*, 96 U. S. 131; *Pickhardt* v. *Merritt*, 132 U. S. 252, 258, 259; *Lang* v. *United States, supra.* We are unable to hold, therefore, on the record presented, that the involved dog food is dutiable under paragraph 730, *supra*, by virtue of the similitude provision contained in paragraph 1559, *supra*. Accordingly, although we are not in harmony with the views expressed by the trial court, the judgment must, for the reasons hereinbefore stated, be *affirmed*. [Italics not quoted.]

In the case of *Tower* v. *United States*, 25 C. C. P. A. 408, T. D. 49486, at pages 408, 413, our appellate court, in passing upon the similitude between a byproduct feed and a material the result of grinding a mixture of oats, barley, wheat, and certain impurities, insofar as the material, quality, texture, and use of the two products were concerned, noted the distinction between the two as follows:

> .\* \* \*. In the one instance there is a by-product. In the other, with the exception of the oat hulls, nothing is removed from the whole grain contained therein. The better and more desirable parts of the grain mixture are retained in the latter instance while in the first instance the by-products are the left-overs. *It is true there is some similarity of use—that is to say, they are both fed to stock or used in making stock feed.* Millet and various other things are used for feeding stock, but *there must be more similarity than the fact that they are both fed to stock to suggest the applicability of the similitude provision.*

> *As to similarity of texture,* it is to be noted that the paragraph calls for bran, shorts, by-product feeds obtained in milling wheat or other cereals; hulls of oats, barley, buckwheat, or other grains, ground or unground; dried beet pulp, malt sprouts, and brewers' grains; various kinds of oil cake and oil-cake meal; and

mixed feeds, consisting of an admixture of grains or grain products with oil cake, oil-cake meal, molasses, or other feedstuffs. *It is true that shorts and the imported merchandise both have mealy and floury characteristics but the same is true of slaked lime and wheat flour. The imported material obviously has little similarity in texture to any of the articles named in paragraph 730.*

Clearly, *the quality of the imported merchandise is not similar to that of bran, shorts, and the other articles named in the paragraph. It would seem to be of higher quality.*

We, therefore, are of the opinion that the goods at bar do not bear sufficient similarity either in material, quality, texture, or use to the articles provided for in paragraph 730 to justify the application of the mandate of paragraph 1559 in the manner urged by the appellant. [Italics not quoted.]

The sample of dog food which both of the plaintiff's witnesses observed being manufactured in Argentina contained sufficient grain products to bring it within the definition of a "substantial quantity" deemed necessary by the Treasury Department for classification under the mixed-feeds provision. However, neither of these witnesses was able to establish that the imported product here under consideration was manufactured in accordance with such formula. The fact that there had been no complaints is clearly insufficient to establish that such merchandise conformed to sample. Upon the other hand, the only evidence as to the grain content is found in the testimony of the Government chemist who determined that there was only 5.8 per centum of grain. Regarding the classification of the product directly under paragraph 730, as amended, it first becomes essential to determine whether or not the imported article is unfit for human consumption. From the foregoing testimony we are of the opinion that it has not been established that the dog food imported herein is not edible. If edible it cannot be classed as unfit for human consumption. In our opinion it also seems to be an essential element of proof to establish that the fresh meat, the carrots, the spinach, and the brewers' yeast, all well-known articles of food for human consumption, come within the common meaning of "other feedstuffs." It has been suggested by Government counsel that the term "other feedstuffs" is intended to embrace only such feeds as are of the same general character as the feeds *eo nomine* appearing in the paragraph. Then again, as pointed out by Government counsel, paragraph 730 covers essentially grain and vegetable byproducts, and the "mixed feeds" provided for therein should contain a substantial amount of the products therein named, that is to say, a "mixed feed" should contain grain or grain products of essential value or in considerable amount, vital and important to the product and having a real practical value. The record as a whole is convincing that the merchandise has not been shown to be properly dutiable under the provision for mixed feeds. Under the *Tower* case, heretofore cited, clearly it is not similar in material, quality, texture, or use, as required under the similitude provision. The merchandise not being classifiable either directly or

by way of similitude under the provisions of paragraph 730, as a mixed feed, it is held properly dutiable as a nonenumerated manufactured article under paragraph 1558, as assessed by the collector.

For the reasons stated, judgment will be entered in favor of the Government.