(C. D. 1460)

WILBUR-ELLIS COMPANY *v.* UNITED STATES

United States Customs Court, Third Division

(Decided August 14, 1952)

*Lawrence, Tuttle & Harper (Walter I. Carpeneti* of counsel) for the plaintiff.
*Charles J. Wagner*, Acting Assistant Attorney General (*Daniel I. Auster* and *Richard M. Kozinn*, special attorneys), for the defendant.

Before CLINE, EKWALL, and JOHNSON, Judges; CLINE, J., not participating

EKWALL, Judge: This is a protest against the collector's assessment of duty on 500 crates of frozen rabbits in fur at 3 cents per pound under paragraph 704 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T. D. 51802, as game. It

is claimed that the skins and meat of the rabbits are segregable; that the skins are free of duty under paragraph 1681 as furs and fur skins, undressed; and that duty should have been assessed under paragraph 704, *supra*, on the net weight of the meat only.

The pertinent provisions of the tariff act are as follows:

PAR. 704 [as modified by the General Agreement on Tariffs and Trade, T. D. 51802]. Other game (except birds), fresh, chilled, or frozen, not specially provided for, 3¢ per lb.

PAR. 1681. Furs and fur skins, not specially provided for, undressed. [Free.]

SEC. 508. COMMINGLING OF GOODS.

Whenever dutiable merchandise and merchandise which is free of duty or merchandise subject to different rates of duty are so packed together or mingled that the quantity or value of each class of such merchandise can not be readily ascertained by the customs officers, the whole of such merchandise shall be subject to the highest rate of duty applicable to any part thereof, unless the importer or consignee shall segregate such merchandise at his own risk and expense under customs supervision within ten days after entry thereof, in order that the quantity and value of each part or class thereof may be ascertained.

At the trial William B. Lim, examiner at the port of San Francisco, testified that he had examined the merchandise involved herein and had made a segregation of a portion thereof at the request of the importer. As a result of examining 1 crate containing 24 rabbits, he found the total weight of the rabbits to be 67¼ pounds. The carcasses weighed 48¼ pounds, or approximately 72 per centum of the total weight; the skins, 8¼ pounds, or approximately 12 per centum of the total weight; and the heads and feet, 10¾ pounds, or approximately 16 per centum of the total weight. Mr. Lim added that he had made a similar type of segregation with reference to another entry not now before the court and the results were approximately the same. On cross-examination, he stated that the segregation was made only because of the request of the importer.

It was agreed by counsel that the importation consisted of whole dead rabbits, with the exception of the entrails, which had been removed prior to exportation.

The only point at issue is whether the merchandise was properly assessed with duty as an entirety or whether the skin and the meat should have been classified separately.

A similar question was involved in *United States* v. *Myers & Co.*, 11 Ct. Cust. Appls. 409, T. D. 39322, in connection with carcasses of calves imported with the skins attached. The collector held that the carcasses and the skins were entireties and assessed duty on the gross weight under paragraph 14 of the Emergency Tariff Act of 1921 as veal. It was claimed that the skins were free of duty under paragraph 604 of the Tariff Act of 1913 as "Skins of all kinds, raw" and that duty should have been assessed under paragraph 14 on the net weight of the carcasses only. The court sustained the protest, stating (p. 411):

We regard it as certain that in common parlance the word "veal" is applied only to the butcher meat of a calf's carcass and not to the skin which covers it. The Standard Dictionary defines the word as "The flesh of a calf when killed and used for food." There is no evidence whatever in the record tending to establish a different commercial or trade definition for the term, but, on the other hand, in so far as the evidence touches upon that subject it is disclosed that calves' carcasses with the skins still attached are quoted, bought, and sold as consisting in fact of two commodities instead of one. It is of course within common knowledge that the calfskin is always removed from a carcass before any part of the latter is sold as veal. In tariff nomenclature also veal and calfskins have long been treated as separate entities. We need not cite specific references in support of this statement.

In view of these considerations we think that the question herein submitted finds its answer in the established rule that where an importation consists of two distinct and segregable tariff entities, which, however, are attached to one another or commingled together, they should nevertheless be separately treated in the assessment, each accordingly bearing the rate of duty applicable to it, or admitted free of duty if entitled thereto. In the present case, therefore, the veal of the carcasses should have been assessed with duty as such at the rate of 2 cents per pound, while the skins should have been admitted free of duty.

Defendant claims that this case is readily distinguishable from the one at bar on the ground that the term "veal" itself indicated the flesh of a calf, while the term "game" indicates the animal itself. It is true that the word "veal" is now limited in meaning to "The flesh of a calf used for food," although it formerly included the calf itself. (Webster's New International Dictionary.) On the other hand, the pertinent meanings of the term "game" include "An animal or animals under pursuit or taken in hunting; quarry; in a collective sense, the various animals (chiefly birds and mammals) which are considered worthy of pursuit by sportsmen" and "The flesh of any game mammal or game bird considered as an article of food." (Webster's New International Dictionary.) (See also Funk & Wagnalls New Standard Dictionary; Encyclopaedia Britannica, volume 10, page 1.) We must ascertain, therefore, in which sense the term "game" has been used in tariff statutes.

In the Tariff Act of 1909, "game" was included in paragraph 285 covering "Fresh beef, veal, mutton, lamb, pork, and venison and other game, except birds." In the Tariff Act of 1913, "game" was placed in paragraph 227 covering "Venison, and other game, * * *; game birds, dressed." In 1922, the provision (paragraph 704) was enlarged to include "Reindeer meat, venison and other game (except birds)." The Summary of Tariff Information, 1921, prepared by the United States Tariff Commission for the use of Congress in enacting said Tariff Act of 1922, states in connection with reindeer meat (pp. 642, 643):

*Description and uses.*—* * * The average dressed weight of the carcass is 150 pounds. The meat is not a "game" variety, but has a distinctive, fine flavor and in quality has been classed with beef and mutton.

  *    *    *    *    *    *    *

*Important changes in classification.*—In this paragraph relating to game other than birds (par. 712) a new specific provision has been made for reindeer meat which resembles game in use.

See also the Summary of Tariff Information, 1929, prepared prior to the enactment of the Tariff Act of 1930, (pp. 1042, 1043):

#### REINDEER MEAT

**Description and uses.**—Reindeer meat is not a game variety. It has a distinctive flavor, and a quality midway between high-grade beef and choice lamb. * * *

\* \* \* \* \* \* \*

#### VENISON

**Description and uses.**—Venison is the meat of wild deer. * * *

The Tariff Act of 1930 (paragraph 704), prior to modification, provided for "Reindeer meat, venison and other game (except birds), fresh, chilled, or frozen, not specially provided for." A more recent Summary of Tariff Information (1948), issued after the modification of said paragraph by the General Agreement on Tariffs and Trade, T. D. 51802, contains the following in connection with "game" (volume 7, part 1, p. 59):

This summary covers game meat, * * *. Meats under discussion in this summary are principally bear, moose, and wild rabbit.

* * * The sale of rabbit meat is known to be quite large and is thought to be predominantly from domesticated rabbits (not covered by this summary), although the quantity of wild rabbit meat may be considerable. Domestic production, whether it be from domestic or wild rabbits, competes directly with imported wild rabbit meat. * * *

* * * The prewar imports from Australia—by far the principal source of imports of the game meats here considered (see table 2)—were frozen wild rabbit meat and entered chiefly through Pacific ports; * * *.

In the Geneva agreement the duty on the game meats covered by this summary was reduced from 6 to 3 cents per pound.

Since it appears fom the foregoing that the term "game" has been consistently coupled with provisions for other meat items, it is evident that Congress was using it in the sense of game meat and not in the sense of game animals. Note in this connection, paragraph 1682 of the Tariff Act of 1930 which provides for free entry for "Live game *animals* and birds, imported for stocking purposes," and "game *animals* and birds" killed abroad by United States residents and imported for noncommercial purposes. [Italics supplied.]

Defendant states in its brief that in the *Myers* case the act provided for skins and hides of bovines and the court held calfskin to be a separate tariff entity, while there is no specific provision for rabbit fur and rabbit meat, and they are not separate entities. It appears, however, that in the *Myers* case the provision cited covered skins of all kinds, raw, and hides, not specially provided for, while in the instant case the provision covers furs and fur skins, not specially

provided for, undressed. Rabbit skin is included within that provision for fur skins, just as the calfskin in the *Myers* case was included under skins of all kinds. Rabbit meat is included under the provision for game, which, as we have pointed out, refers to game meat. Therefore, there are two separate provisions for skin and meat in the instant case, as in the *Myers* case.

Defendant also refers to a statement in the *Myers* case that there was evidence that calves' carcasses with the skins attached were bought and sold as two commodities, while there is no such evidence as to the rabbits in the instant case. However, it was also stated in the *Myers* case that imported carcasses of calves could find no buyers in the New York market unless the skins were still attached. The *Myers* case cannot be distinguished from the instant case on two such apparently contradictory statements.

Here, as in the *Myers* case, there are two distinct and segregable tariff entities (rabbit meat, included under the provision for game, and rabbit skins, included under the provision for fur skins) which are attached to each other, but which should, nevertheless, be separately treated in the classification and assessment of duty.

Since a portion of the merchandise involved herein has been segregated under customs supervision, as provided by section 508 of the Tariff Act of 1930, and since no objection has been raised as to the sufficiency of the portion segregated, we hold that the rabbit skins, constituting 12 per centum of the importation, are entitled to free entry under paragraph 1681 of the Tariff Act of 1930, as fur skins, not specially provided for, undressed, and that the rabbit meat, constituting 88 per centum of the importation, is properly dutiable at 3 cents per pound under paragraph 704 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T. D. 51802, as other game, not specially provided for.

The protest is sustained and judgment will be rendered accordingly.